**CHARLAND LAW FIRM, LLC**
202 East Earll Drive
Suite 490
Phoenix, AZ 85012
602-944-7499
litigation@CharlandLawFirm.com

Name and State Bar No. John E. Charland, Esq. #012089

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ALYSSA BROOME, | CASE NO.: |
| PLAINTIFF, | **COMPLAINT** |
| VS. | **1: American with Disabilities Act**<br>**2: Americans with Disabilities Act**<br>**3: Americans with Disabilities Act**<br>**4: Americans with Disabilities Act**<br>**5: Americans with Disabilities Act**<br>**6: Retaliation**<br>**7: Genetic Information**<br>   **Nondiscrimination Act**<br>**8: Punitive damages**<br>**9: Attorney fees**<br>**10: Injunctive Relief -**<br>   **Reinstatement** |
| CARSARRIVE NETWORK, INC., a Corporation;   KAR   AUCTION SERVICES, INC., a corporation, | |
| DEFENDANTS. | |

Alyssa Broome complains of defendants as follows:

## PARTIES, JURISDICTION & VENUE

1.     Plaintiff Alyssa Broome is a resident of Maricopa County, State of Arizona.

2.     On information and belief, CarsArrive Network, Inc. is an Arizona corporation, licensed to do business in Arizona.

1

3.     On information and belief, KAR Auction Services, Inc. is a Delaware corporation and is doing business in Arizona.

4.     Defendants are an employer as defined by 42 U.S.C. §§ 2000e-2(a) & (b) and 12111(5)(A).

5.      This court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-5(f)(3).

6.      Venue in this district is proper based on 28 U.S.C. § 1391 because the events complained of in this complaint occurred in this district.

7.     Alyssa Broome has exhausted all administrative remedies prior to filing this complaint and has obtained a right to sue letter from the EEOC to pursue these claims.

## ALLEGATIONS

8.     Alyssa Broome has a disability and genetic medical condition known as Ehlers-Danlos Syndrome ("EDS").

9.     EDS is an incurable genetic condition one inherits that affects the connective tissues of a person's body.  It is a condition that rises to a level of severity of life-threatening.

10.     At all times material hereto, Ms. Broome's EDS medical condition was an impairment that substantially limited major life activities.

11.     The impairment is a physiological disorder that attacks the connective tissue and that affects bodily systems and functions, such as walking, use of the joints, breathing, and most other neurological and cardiological functions.  EDS is an associated dysfunction of the autonomic nervous system.  Alyssa cannot perform these functions as a normal person can even with medications and treatment, but she can function and perform the essential functions of her job, if accommodated by, for example, being allowed to administer her treatment and medication.

12.     Alyssa Broome reported her condition early on to members of management.

13.     Some persons such as the Director of HR, Michelle Lefland, actively followed Alyssa on social media where she spent her time educating about EDS.

14.     Members of management asked about and were informed that Alyssa had surgery because of her genetic connective tissue disorder.

15.     Alyssa Broome initially began working as a sales associate for respondents' business enterprise, ADESA, in April 2012.

16.     ADESA is a business unit of KAR, like CarsArrive is a business unit of KAR.

17.     While at ADESA, Alyssa exceeded quota expectations repeatedly and in 2014 alone she sold 63,000 cars.  She finished that year at 400% of the set goal. She was highly regarded at the company.

18.     In 2015 Alyssa left ADESA to work for one of its customers which had recruited Alyssa because of the work Alyssa had done as their account manager at ADESA.

19.     Alyssa's time away from respondents was short-lived however as the vice-president of CarsArrive informed her that ADESA had just purchased a competitor, Dependable Auto Shippers ("DAS"), and he wanted Alyssa to come back to KAR to work at CarsArrive as the sales manager in the Mesa office.

20.     Alyssa agreed to interview for the position and she accepted CarsArrive's employment offer.

21.     At no time did management state that Alyssa's in-person presence was critical or required.   To the contrary, as outlined below, management emphasized how flexible the company was with both time off and the need to be out of the office.

22.     Alyssa began work on October 9, 2017.

23.     As sales manager, Alyssa Broome started by supervising a crew of five persons which was then soon increased to eight persons when her duties

quickly expanded and she was assigned the additional duties of Service Manager.

24.     Her supervisor, the Director of Sales, Erin Almand, who came to CarsArrive as a holdover from DAS, was stationed in Dallas.

25.     During Alyssa Broome's time at CarsArrive, Erin Almand openly voiced discriminatory views and administered discriminatory practices against disabled and older employees and prospective employees based on a notion that they were weak and an impediment to success.

26.     Ms. Almand set a goal for the sales associates that was completely unrealistic and virtually impossible to meet and it was actually inconsistent with corporate's budgeted income figures which were challenging, but attainable.

27.     Ms. Almand set these numbers high from the outset to have an allegedly legally justifiable basis to terminate employees who were not meeting their quota as a pretext, thereby masking her true discriminatory animus.  By setting unattainable figures that no one has ever reached, Ms. Almand provided herself a ready made pretext for terminating employees with discriminatory animus.

28.     An employer can set whatever quota it wants to set and terminate employees who do not meet the quota even if the quota is impossible to reach and even though the employer would end up terminating good workers as a result thereby making counterproductive business decisions and displaying

poor management skills; however, an employer cannot use that facially neutral virtually impossible goal as a pretext to disguise a motivating factor of discriminatory animus against disabled or older workers so to terminate or discriminate against those employees.

29.     Despite these difficult challenges, Alyssa increased sales month after month.

30.     Her and her team's level of success allowed them to be on track to meet the rigorous budgetary requirements.

31.     In December 2017, Alyssa asked for an accommodation of using a heating pad.  EDS causes joint pain.   Generalized and often severe joint pain is a common consequence of EDS.  A failure to treat the joint pain with heat further exacerbates the condition.

32.     The heating pad would have helped ameliorate and soothe the employees' joint pain caused by her EDS.

33.     At that time at least three other persons at the Mesa Office were using space heaters or electric blankets because the employer kept the work site very cold.

34.     These others used their heating devices openly and in plain sight and it would have been impossible for the HR staff not to have seen it.

35.     Despite Alyssa's medical need for a manner in which to ameliorate the joint pain from the frigid environment, HR told Alyssa Broome the answer was "absolutely not" because using a heating pad would cause an undue fire hazard and be a drain on the electrical system.

36.     When management denied the request claiming that a heating pad would endanger the electrical system and would be a fire hazard, Alyssa offered to purchase and use a battery operated heating pad which would have absolutely no effect on the wiring system.  HR outright refused to allow that accommodation as well.

37.     At no time did HR or anyone at KAR engage in the interactive process with Alyssa Broome in an effort to accommodate the disability.

38.     Alyssa also offered to purchase a heating pad that turns off automatically so there could be no claim of an alleged fear of a fire.

39.     She offered to purchase a heating pad that plugs into one's computer's USB port so that there would be no alleged "surge."

40.     To each request, the answer was "no."

41.     HR later admitted that management did not realize it was supposed to engage in communication with Alyssa to see how it could accommodate her disability needs.

42.    To support her need for an accommodation of using the heating pad, Alyssa Broome brought in a note from her doctor stating a heating pad was needed in conjunction with Alyssa's EDS.   HR refused to comply with the medical request.

43.    The undisputed fact that a heating pad is a valid form of an ADA accommodation and used as a medical device is proved by the fact that heating pads are labeled "FSA" which means they are designated Flexible Spending Account approved.   Thus, it is a qualified medical expense under federal law.

44.    Alyssa soon saw that a pattern of this employer's discriminatory animus was developing or already existed and it was not restricted to discriminating against her.

45.    At about the same time, December 2017, Alyssa witnessed forms of Erin Almand's discriminating against other employees.   For example, in that month employee David Soto had a birthday and Erin Almand commented that she was shocked to learn that David was only in his early 40s because he seemed "way older" and that he had "no energy."

46.    Ms. Almand would refer to Mr. Soto as "old and lame."

47.    Prior to December 2017, CarsArrive hired a contractual employee named Patricia Diaz as a sales associate.

8

48.     Ms. Diaz was the only member of the sales team to hit the sales quota on a number of occasions.

49.     Ms. Diaz was a good worker and Alyssa sought to employ Ms. Diaz as a regular employee of the company.

50.     Ms. Diaz however suffered from fibromyalgia, a medical condition that did not keep Ms. Diaz from being able to do her job or to contribute to the company or to lead the sales associates in sales, but which did cause Ms. Diaz to need medical time off on a couple of occasions.

51.     Given Ms. Diaz's competent performance, Alyssa began the process of hiring Ms. Diaz as a CarsArrive employee, instead of Ms. Diaz's working as a contractor, and Alyssa got approval to tender Ms. Diaz an offer of employment.

52.     However, while the offer was pending, Ms. Diaz suffered a medical episode and she had to leave work to go to the hospital because of her medical condition.

53.     Ms. Almand responded to Ms. Diaz's going to the hospital by going around Alyssa and rescinding the offer of employment and Ms. Almand actually terminated Ms. Diaz as a contractor as well.

54.     Not satisfied, Ms. Almand then also marked Ms. Diaz as ineligible for hire in any other department of CarsArrive.

9

55.     There was only one reason for these acts, Ms. Almand was discriminating against Ms. Diaz for having a disability that caused Ms. Diaz to need to be accommodated by short times off, but Ms. Diaz still could outperform everyone else, if accommodated.

56.     In January, the pattern of invidious discrimination continued when Alyssa Broome and her boss, Erin Almand, engaged in the interviewing of prospective sales associates.

57.     In the interview process Ms. Almand openly stated that she was looking for a youthful sales team and that her hiring practices entailed looking at the dates employment candidates graduated from college so that she could weed out anyone who was older.

58.     There in fact was one applicant who was qualified but he obtained his degree from Boston University in 1985 and Ms. Almand rejected his application because he was "too old."

59.     In February, Alyssa Broome's medical condition took a downturn and she was required by her healthcare providers to begin daily IV infusions at home.  The IV was to run overnight through an IV catheter in her hand or arm.

60.     Unfortunately, sometimes the IV simply would not finish before Alyssa needed to be at work.  Poor venous access can be common with EDS.  In late

February 2018 at the encouragement of her home nursing team and specialist, she had a chest port surgically implanted to facilitate continued IV treatment.

61.     One day in February 2018, when the IV did not fully drain, Alyssa brought the IV to work and placed it on a short stand in the shape of an art easel and she put the easel on her desk to elevate it so it would operate.

62.     Alyssa made sure the stand was secured.  It was not shaking at all and had no reasonable risk of ever falling.

63.     Shortly thereafter Deanna French from HR came by and told Alyssa that Alyssa would have to take the IV down because it was "making people uncomfortable."

64.     Alyssa pointed out that she needed the IV for medical purposes, but Ms. French and HR refused to listen.

65.     Defendants refused to engage in any dialogue or discussion about any other alternative.  Defendants never engaged in the interactive process and it never suggested anything that might accommodate Alyssa Broome.

66.     Given the importance to her health of having the IV and that there was no reason she should not be able to complete the IV other than allegedly someone felt "uncomfortable," Alyssa called Erin Almand to see what could be done and Alyssa explained the imperative medical need for the IV.

11

67.    Ms. Almand recommended that Alyssa obtain a special phone from the IT department that Alyssa could take with her and work from home.  This is a specialized phone that allows access to internal communications.

68.    This was a legitimate accommodation and it shows that working at home and not at the office was a perfectly reasonable way for Alyssa to perform her job functions so to complete her IVs when needed.

69.    Unfortunately, the IT department did not then have the adapter necessary to allow the phone to function outside of the office.  The IT person, Coye, said he would order the adapter and that the phone would be ready soon.

70.    Alyssa then went home without a phone which prevented her from monitoring phone calls but she still was able to be productive by using her cell and her computer.

71.    About 10 days later IT sent an email to Alyssa asking whether she still needed the phone.  Alyssa hit "reply all" and responded yes she did.

72.    As a recipient of that email, Erin Almand read it and then sent an email to Alyssa stating to cancel the phone request, that the offer to allow Alyssa to work from home only that one time and Ms. Almand did not want to look like she was "playing favorites," by accommodating Alyssa's needs.

73.   In other words, Almand thought that she would be giving something to Alyssa as an accommodation for her health condition that others would not be getting because they do not have the health condition and she refused to do that.

74.   Alyssa walked over to the IT department and spoke to Coye and canceled the order.  Coye insisted it was "not a big deal" for Alyssa to have the phone in case a future need arises and offered Alyssa the phone anyway, which she accepted, not with any intent to ever use it, unless she had to leave work again and of course first only if she had permission both to leave work that hypothetical day and to use the phone.

75.   At no time did Alyssa think she was doing anything inconsistent with the spirit of Almand's instruction, which was not to work at home at will or Almand would look like she was showing favoritism toward her.  Alyssa understood if the need arose she would need to ask and would be given permission to work at home to complete the IV, in which case the phone would be handy to have.

76.   In fact, Alyssa never again did work at home or seek to do so.  She never used the phone.  Alyssa was humiliated that someone complained about the IV bag and Alyssa was distressed and depressed that her employer agreed with that person and did not accommodate, support, or protect Alyssa's need to complete the medication process.  She also understood the clear message was

13

that she had no alternative allowed by the employer as it wished to avoid showing alleged favoritism.  Alyssa therefore was forced to not complete the IV infusion when those occasions arose and to go to work without a complete infusion which harmed her health.

77.     Ms. Almand knew but never said anything to Alyssa about Alyssa's accepting IT's offer to hold onto the phone in case a future need arose.

78.     On March 7, 2018 Ms. Almand instructed Alyssa to write up sales associate David Soto, the "old" and "lame" employee so to begin the process of terminating him.

79.     Alyssa Broome was very uncomfortable because severe discipline simply was not commensurate with his performance and Alyssa suspected what really was in play was Almand's discriminatory animus and Alyssa did not want to sanction it, nor did she want to resist it and become further targeted herself. Alyssa tried to reason with Ms. Almand by explaining a lesser form of discipline would be more appropriate.

80.     Alyssa decided that if Ms. Almand would not agree, then Alyssa would have no choice but to write Mr. Soto up.

81.     The very next day Ms. Almand disciplined Alyssa for not having written up David Soto immediately and at that point Ms. Almand also brought up the fact that Alyssa possessed the phone that she never had used.

82.     Almand thus used these two events, that occurred at different time frames, to serve on March 8, 2018 as two steps in the progressive disciplinary process and to place Alyssa on probation.

83.     The discipline against Alyssa for not writing Mr. Soto up just the day before and coupling it with a past event was retaliation for Alyssa's resisting an unlawful act and discrimination both for Alyssa's taking a step that would allow an accommodation of her disability for when the need arose and for her hesitating, but certainly never refusing, an order to write up an employee on what appeared to be a pretext to mask discriminatory animus.

84.     Ms. Almand in one setting disciplined Alyssa with a verbal warning, the first step in the progressive disciplinary system, for not writing Mr. Soto up the very same day the instruction to do so was given to Alyssa.

85.     Almand also disciplined Alyssa with a "written warning" the second step in the progressive disciplinary process by going back in time to Alyssa's possessing the IT phone.

86.     Ms. Almand disciplined Alyssa with a "put on probation" adverse action, the third step in the process, for alleged substandard performance, of Alyssa's performance as a supervisor, and because Alyssa was not selling the company's product to the point of meeting the standards Ms. Almand dictated.

87.    At that same time, Ms. Almand raised Alyssa's sales goals and standards even further for what Alyssa would have to meet in order not to be terminated.

88.    After placing Alyssa Broome on probation, HR told Alyssa to seek another position at KAR.

89.    Believing the invitation was sincere, Alyssa looked for other positions at KAR and was quickly successful, as manager David Gonzalez stated he would love to have Alyssa on his team.

90.    Suddenly, HR told Alyssa that she could not transfer.

91.    Defendants explained that they had a policy that required an employee to be in their position for six months before the employee was allowed to transfer to a new position.

92.    This was not a problem as Alyssa was into her fifth month and her six-month period was about to expire and certainly would have expired by the time she transferred.

93.    However, defendants told Alyssa that while the then existing policy required a 6 month stay in a position before transferring, defendants were working on a new policy, that was not yet in effect, but that was being worked on and that new policy would require employees to be in the same position for a full year before they could transfer.

16

94.     Management then stated based on the fact that the plan was being devised, even though it had not yet been adopted, management would apply the not-yet-implemented 12 month policy to Alyssa and thereby block Alyssa from transferring to the other position.

95.     In other words, the employer applied a policy that was not in existence to prevent Alyssa from transferring even though there was a position open and the manager of that position wanted to have her.

96.     The purpose of defendants' refusal to follow their own plan was to retaliate against Alyssa on the basis of discrimination and continue the plan of eliminating her and her disability.

97.     Alyssa Broome's case presents a situation where the mental and emotional exhaustion from the constant campaign of discrimination against herself and from witnessing the same wrongs committed against members of her staff because of disabilities or age, coupled with the deterioration of Alyssa's physical condition by not being allowed to complete her IVs at work or to complete them at home while she briefly worked there (which meant she was not getting the treatment she needed to treat the EDS), led to unmanageable stress and mental, emotional, and physical deterioration to the point that Alyssa needed leave.

98.     Without the possibility of a transfer away from the position that would not allow accommodation and with her medical condition deteriorating, on March 15 Alyssa applied for short term disability because of her EDS's severe exacerbation.

99.     Company policy allows short term disability for all such persons.

100.    Alyssa's doctor thought it could be necessary for Alyssa to be out for a number of months maybe up to six months as Alyssa needed rest to get her condition back under control to return to the position she was in.

101.    Alyssa's doctor however was aware that defendants had failed and refused to accommodate Alyssa on past occasions including a failure to transfer Alyssa to a known and available position where she would be further accommodated and not targeted which transfer would have removed the mental and physical assault the employer had made on her condition.  Knowing that the employer had failed and refused and would not transfer Alyssa, the doctor indicated Alyssa needed time off even if the employer would accommodate her.  He meant by this accommodation other than by a transfer to a new position.

102.    Defendants discriminated against Alyssa yet once again by terminating her on April 2, 2018, to cut off her disability benefits to which she was entitled,

similar to the way KAR decided to get rid of Ms. Diaz when she missed work as a result of a disability.

103.    The termination also was in retaliation for Alyssa's resisting discriminatory practices against herself and others.

104.    The company policy was that the employee could remain on short term disability until he or she were replaced by a new hire (or the employee was no longer disabled).

105.    To find a replacement quickly to get rid of Alyssa and terminate her short term disability benefits, defendants hired from within Alyssa's sales force and replaced Alyssa with Lucas O'Malley who had been hired as a sales representative by Alyssa only weeks earlier in February 2018.

106.    Defendants state Lucas O'Malley had been employed with the company for more than a year and therefore transferring him to a new position was not the same as refusing to transfer Alyssa Broome; however, this is false as the policy at issue was not how long one had been employed at the company, but how long one had been employed in his or her position, which for Lucas O'Malley was a matter of weeks.

107.    Alyssa Broome had been employed at KAR and its business units for about three years when refused the transfer to an open position that was available to her.

19

108.    Moreover, Mr. O'Malley had never once met his goals as a sales associate.

109.    He is however a young man consistent with the employment requirements and discriminatory animus of Ms. Almand.

110.    Any exacerbation of any physiological condition Alyssa Broome then was suffering was actually caused by defendants' discrimination by not allowing her to finish her IVs or to work from home for brief time frames while the IV process completed which often would cause Alyssa to be unable to finish the IVs and by repeatedly discriminating against her.

111.    Thus, defendants' discriminatory work conditions had become overwhelming and had harmed Alyssa Broome's health.

112.    Defendants also discriminated based on genetic information.

113.    When Alyssa Broome's genetic testing came back to her she told Ms. Almand how her condition is a genetic one that she inherited from her parents.

114.    In her case Alyssa mentioned to Ms. Almand that her father had the condition that Alyssa inherited it from him in a genetic autosomal dominant pattern and also that Alyssa was a carrier of a rare form her mother must also have.

115.    Alyssa also reported to Ms. Almand that Alyssa chose the neurologist who treats Alyssa's condition because that neurologist also has EDS.

116.    One only is afflicted with EDS by inheriting it.  It is purely genetic.

117.    Defendants were aware of this and worked to terminate Alyssa because of her condition.

## FIRST CAUSE OF ACTION
**(Americans with Disabilities Act – failure to accommodate heating device)**

118.    CarsArrive Network, Inc. is an "employer" as defined in 42 U.S.C. § 12111(5).

119.    KAR Auction Services is an "employer" as defined in 42 U.S.C. § 12111(5).

120.    Alyssa Broome is a qualified individual with a disability as defined in 42 U.S.C. § 12111(8).

121.    Her impairment includes Ehlers-Danlos Syndrome ("EDS").

122.    Ms. Broome's disability keeps her from performing or would substantially limit her performing major life activities.

123.    Defendants regarded Ms. Broome as having an impairment within the meaning of 42 U.S.C. § 12102(2)(c), because Ms. Broome's superiors believed that Ms. Broome's disorder prevented her from performing the duties of her position.

124.    Ms. Broome is and was able to perform the essential functions of her job with reasonable accommodation.

125.    Defendants refused to accommodate Ms. Broome by allowing Ms. Broome to use a heating pad at work. Such an accommodation was reasonable and would not effect a hardship on defendants.

21

126.    Defendants failed and refused to propose any accommodations.

127.    Defendants have intentionally discriminated against Ms. Broome because of her disability with respect to the terms and conditions and privileges of employment.

128.    Such discrimination includes, but is not limited to, refusing to allow her to administer treatment in the form of a heating pad.

129.    As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to physical pain, emotional pain, suffering, mental anguish, loss of enjoyment of life, disabling harm, medical bills, attorney fees, and costs.

## SECOND CAUSE OF ACTION
**(Americans with Disabilities Act – failure to accommodate IV treatment)**

130.    CarsArrive Network, Inc. is an "employer" as defined in 42 U.S.C. § 12111(5).

131.    KAR Auction Services is an "employer" as defined in 42 U.S.C. § 12111(5).

132.    Alyssa Broome is a qualified individual with a disability as defined in 42 U.S.C. § 12111(8).

133.    Her impairment includes Ehlers-Danlos Syndrome ("EDS").

134.    Ms. Broome's disability keeps her from performing or would substantially limit her performing major life activities.

22

135.    Defendants regarded Ms. Broome as having an impairment within the meaning of 42 U.S.C. § 12102(2)(c), because Ms. Broome's superiors believed that Ms. Broome's disorder prevented her from performing the duties of her position.

136.    Ms. Broome is and was able to perform the essential functions of her job with reasonable accommodation.

137.    Defendants refused to accommodate Ms. Broome by allowing Ms. Broome to administer her IV at work.

138.    Defendants failed and refused to propose any accommodations or they removed the accommodations they had suggested.

139.    Defendants have intentionally discriminated against Ms. Broome because of her disability with respect to the terms and conditions and privileges of employment.

140.    Such discrimination includes, but is not limited to, refusing to accommodate Ms. Broome by allowing her to administer her IV at work. Such an accommodation was reasonable and would not effect a hardship on defendants.

141.    As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to physical pain, emotional pain, suffering, mental anguish, loss of enjoyment of life, disabling harm, medical bills, attorney fees and costs.

## THIRD CAUSE OF ACTION
### (Americans with Disabilities Act - failure to transfer)

142.    CarsArrive Network, Inc. is an "employer" as defined in 42 U.S.C. § 12111(5).

143.    KAR Auction Services is an "employer" as defined in 42 U.S.C. § 12111(5).

144.    Alyssa Broome is a qualified individual with a disability as defined in 42 U.S.C. § 12111(8).

145.    Her impairment includes Ehlers-Danlos Syndrome ("EDS").

146.    Ms. Broome's disability keeps her from performing or would substantially limit her performing major life activities.

147.    Defendants regarded Ms. Broome as having an impairment within the meaning of 42 U.S.C. § 12102(2)(c), because Ms. Broome's superiors believed that Ms. Broome's disorder prevented her from performing the duties of her position.

148.    Ms. Broome is and was able to perform the essential functions of her job with reasonable accommodation.

149.    Defendants refused to accommodate Ms. Broome by allowing Ms. Broome to transfer to an open position.

150.    Defendants failed and refused to propose any accommodations.

151.    Defendants intentionally discriminated against Ms. Broome because of her disability with respect to the terms and conditions and privileges of employment.

152.    Such discrimination includes, but is not limited to, failing and refusing to allow Ms. Broome to transfer to another position where she would be accommodated and where she was not targeted by a supervisor who intended to fire Ms. Broome for unlawful purposes.

153.    As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to physical pain, emotional pain, suffering, mental anguish, loss of enjoyment of life, disabling harm, medical bills, attorney fees and costs.

## FOURTH CAUSE OF ACTION
### (American with Disabilities Act - termination)

154.    CarsArrive Network, Inc. is an "employer" as defined in 42 U.S.C. § 12111(5).

155.    KAR Auction Services is an "employer" as defined in 42 U.S.C. § 12111(5).

156.    Alyssa Broome is a qualified individual with a disability as defined in 42 U.S.C. § 12111(8).

157.    Her impairment includes Ehlers-Danlos Syndrome ("EDS").

158.    Ms. Broome's disability keeps her from performing or would substantially limit her performing major life activities.

159.    Defendants regarded Ms. Broome as having an impairment within the meaning of 42 U.S.C. § 12102(2)(c), because Ms. Broome's superiors believed that Ms. Broome's disorder prevented her from performing the duties of her position.

160.    Ms. Broome is and was able to perform the essential functions of her job with reasonable accommodation.

161.    Defendants refused to accommodate Ms. Broome by their terminating Alyssa Broome and by their not allowing Ms. Broome to work as a sales manager or to remain on short term disability until her medical condition resolved.

162.    Defendants failed and refused to propose any accommodations.

163.    Defendants intentionally discriminated against Ms. Broome because of her disability with respect to the terms and conditions and privileges of employment.

164.    Such discrimination includes, but is not limited to, firing Ms. Broome because of her EDS.

165.    As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to loss of back pay, interest on back pay, front pay, interest on

front pay, loss of benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, attorney fees and costs and medical expenses and injury.

### FIFTH CAUSE OF ACTION
**(Americans with Disabilities Act – perceived disability discrimination)**

166.   CarsArrive Network, Inc. is an "employer" as defined in 42 U.S.C. § 12111(5).

167.   KAR Auction Services is an "employer" as defined in 42 U.S.C. § 12111(5).

168.   Alyssa Broome is a qualified individual with a disability as defined in 42 U.S.C. § 12111(8).

169.   Her impairment includes Ehlers-Danlos Syndrome ("EDS").

170.   Ms. Broome's disability keeps her from performing or would substantially limit her performing major life activities.

171.   Defendants regarded Ms. Broome as having an impairment within the meaning of 42 U.S.C. § 12102(2)(c), because Ms. Broome's superiors believed that Ms. Broome's disorder prevented her from performing the duties of her position.

172.   Ms. Broome is and was able to perform the essential functions of her job with reasonable accommodation.

173.   Defendants refused to accommodate Ms. Broome by allowing Ms. Broome to work as a sales manager or to administer her medications or to

transfer her to another position because it perceived Ms. Broome as being disabled and an ongoing and future liability to the defendants.

174.   Defendants failed and refused to propose any accommodations.

175.   Defendants intentionally discriminated against Ms. Broome because of her disability with respect to the terms and conditions and privileges of employment.

176.   Such discrimination includes, but is not limited to, all the acts of discrimination complained about herein, taken as a result of defendants' perception that Ms. Broome was a person with a disability, consistent with the definition of being regarded as disabled in 42 U.S.C. 12102(3)(A), who would be a burden on the company and its productivity and profit margin and expenses.

177.   As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to loss of back pay, interest on back pay, front pay, interest on front pay, loss of benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, attorney fees and costs and medical expenses and injury.

## SIXTH CAUSE OF ACTION
### (Americans with Disability Act - Retaliation)

178.     Alyssa Broome attempted to oppose the violation of her rights under the ADA.

179.     In response to the knowledge that Alyssa Broome was opposing Almand's ADA violation, Almand disciplined and then terminated Alyssa Broome and refused to accommodate her.

180.     The foregoing acts were an effort by the defendants to interfere, coerce, and intimidate Alyssa Broome from the exercise and enjoyment of rights protected by the ADA.

181.     The foregoing acts constitute a violation and a continuing violation of Alyssa Broome's rights under the ADA.

182.     As a direct and proximate result of the foregoing unlawful retaliatory, intimidating, coercive, and interfering acts and termination, Alyssa Broome has suffered losses including but not limited to loss of back pay, interest on back pay, front pay, interest on front pay, loss of benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, attorney fees and costs and medical expenses and injury.

## SEVENTH CAUSE OF ACTION
### (Genetic Information Nondiscrimination Act)

183.    Defendant CarsArrive Network, Inc. is an employer within the meaning of 42 U.S.C. § 12111(5) and 42 U.S.C. 2000e(b)) .

184.    Defendant KAR Auction Services is an employer within the meaning of 42 U.S.C. § 12111(5) and 42 U.S.C. 2000e(b)).

185.    Alyssa Broome is an employee as defined by 42 U.S.C. 2000e(f) and section 201 of GINA.

186.    Defendants were aware that Alyssa Broome was afflicted with one type of EDS, but based on genetic testing results, she actually is a carrier of two types of EDS.

187.    Defendants had conversations about Alyssa Broome's parents' genetic make up and about their being carriers of the EDS genes and about the manifestation of the disorder in Alyssa's family members.

188.    Defendants instituted adverse actions against Alyssa Broome because of her genetic make up and the genetic make up of Alyssa Broome's parents by discharging her and discriminating against her with respect to her compensation, terms, conditions, or privileges of employment, because of genetic information.

189.    Defendants instituted adverse actions against Alyssa Broome because of her genetic make up and the genetic make up of her parents that limited, segregated, or classified Alyssa in a way that deprived or tended to deprive her of employment opportunities or otherwise adversely affected her employment status, because of genetic information.

190.    As a direct and proximate result of the actions and inactions of defendants, Ms. Broome has suffered and continues to incur damages including but not limited to loss of back pay, interest on back pay, front pay, interest on front pay, loss of benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, attorney fees and costs and medical expenses and injury.

## EIGHTH CAUSE OF ACTION
### (Punitive damages)

191.    The conduct of the defendants, and each of them, in deliberately discriminating against plaintiff constitutes intentional, extreme, and outrageous conduct.  Such conduct was motivated solely by greed and is the product of a malicious and evil mind and is so contemptible as to require the imposition of punitive damages, both to punish defendants and to hold them out as an example to the rest of the community so that such conduct will never happen again.

192.    As a direct consequence of defendants' acting with an evil mind, plaintiff is entitled to punitive damages.

## NINTH CAUSE OF ACTION
### (Attorney fees)

193.    Plaintiff is entitled to an award of attorney fees and costs pursuant to Title VII,  the ADA and GINA.

## TENTH CAUSE OF ACTION
### (Injunctive Relief - Reinstatement)

194.    At all times material hereto, Alyssa Broome was a competent and qualified employee.

195.    Defendants wrongfully terminated Alyssa Broome in violation of the ADA and GINA.

196.    Alyssa Broome is entitled to reinstatement into her position as a remedy for defendants' unlawful conduct.

197.    The court is empowered to order reinstatement.

198.    As a result of defendants' violations of the law, plaintiff asks the court to order her reinstatement.

**WHEREFORE,** plaintiff prays for damages as follows:

A.    Back pay,  interest on back pay, front pay, recoupment of lost benefits past and future and prejudgment  and postjudgment interest on all of the foregoing;

B.     Emotional and physical pain and injury, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

C.     Recoupment of medical bills incurred as a result of Alyssa Broome's deterioration caused by defendants

D.     Compensatory damages in an amount to compensate Ms. Broome for her emotional distress and other damages.

E.     Punitive damages to punish defendants for the intentional acts of discrimination.

F.     Reinstatement;

G.     Reasonable attorneys fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

H.     Prejudgment and postjudgment interest; and

I.     Such other and further relief as deemed equitable by the court or permitted by law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable by jury.

RESPECTFULLY SUBMITTED this 9th day of December, 2020.

CHARLAND LAW FIRM, LLC

/s/ John E. Charland
John E. Charland, Esq.
CHARLAND LAW FIRM, LLC
202 East Earll Drive
Suite 490
Phoenix, AZ 85012